# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

UNITED STATES OF AMERICA,      )
     )
     Plaintiff,      )      NO. 3:10-cr-00260
     )      JUDGE HAYNES
v.      )
     )
ABDIFATAH SHARIF OMAR,      )
MOHAMED SHARIF OMAR,      )
     )
     Defendants.      )

## M E M O R A N D U M

The United States filed this action against the twenty-nine Defendants, including

Defendants Abdifatah Sharif Omar and Mohamed Sharif Omar. In the November 3, 2010

Superseding Indictment, the Grand Jury charges Defendant Abdifatah Sharif Omar with the

following offenses:

> Count One - conspiracy to violate 18 U.S.C. § 1591(a)(1) in violation of 18
> U.S.C. § 1594(c); for conspiracy to recruits, entices, harbors, transports, provided,
> obtains or maintains anyone under the age of 14 and under the age of 18 in
> violation of 18/1951(a)(1);

> Count Two - conspiracy to violate 18 U.S.C. § 1591(a)(2) in violation of 18
> U.S.C. § 1594(c) for conspiracy to benefit financially or by receiving anything of
> value, from participating in a venture which recruits, entices, harbors, transports,
> provides, obtains or maintains anyone under the age of 14 and under the age of 18
> in violation of 18/1951(a)(2);

> Count Three - obstruction of justice in violation of 18 U.S.C. § 1512(k) for
> conspiracy to knowingly corruptly persuade another person, or attempt to do so, to
> alter, destroy, mutilate, or conceal an object with the intent to impair to object's
> integrity and availability for sue in an official proceeding and with intent to
> hinder, delay and prevent the communication to a law enforcement officer of
> information relating to the commission or possible commission of the Federal
> Offense;

1

Count Four - obstruction of justice in violation of 18 U.S.C. § 1591(d) for knowingly did attempt to obstruct, and in any way interfere with and prevent the enforcement of Title 18 U.S.C. § 1591(a);

Count Fifteen - conspiracy to transport in interstate commerce goods of a value over $5000 in violation of 18 U.S.C. § 2314 in violation of 18 U.S.C. § 371 for knowingly did attempt to obstruct, and in any way interfere with and prevent the enforcement of Title 18 U.S.C. § 1591(a);

Count Sixteen - conspiracy to transport in interstate commerce a stolen motor vehicle in violation of 18 U.S.C. § 2312 in violation of 18 U.S.C. § 371 for conspiracy to transport in interstate commerce goods, wares, merchandise, securities, and money of the value of $5000 or more knowing the same to have been stolen;

Count Seventeen - conspiracy to possess identification documents in violation of 18 U.S.C. §1028(a)(7) in violation of 18 U.S.C. § 1028(f) for conspiracy to knowingly possess and use an identification document without lawful authority in and affecting interstate commerce, a means of identification of another person with the intent to commit and aid and abet in connection with any unlawful activity that constitutes a violation of federal law;

Count Eighteen - conspiracy to produce, use or traffic in one or more counterfeit access devices in violation of 18 U.S.C. 1029(a)(1), 1029(a)(2), and 1029(a)(3) in violation of 18 U.S.C. 1029(b)(2) for conspiracy to knowingly and with intent to defraud produce, use, and traffic in one or more counterfeit access devices and to knowingly and with intent to defraud traffic in and use one or more unauthorized access devices during any one-year period, and by such conduct obtain anything of value aggregating $1,000 or more during that period, and to knowingly and with intent to defraud possess fifteen or more devices which are counterfeit or unauthorized access devices; and

Count Nineteen - conspiracy to obstruct justice in violation of 18 U.S.C. § 1512(c)(1) and 1512(b)(3) in violation of 18 U.S.C. §1512(k) for knowingly corruptly persuade another person or attempt to do so, to alter, destroy, mutilate, or conceal an object with the intent to impair the object's integrity and availability for use in an official proceeding and with intent to hinder, delay, and prevent the communication to a law enforcement officer of information relating to the commission or possible commission of a Federal Offense, in violation of Title 18 U.S.C. § 1512(c)(1) and 1512(b)(3).

(Docket Entry No. 36, Superseding Indictment).

2

This Superseding Indictment also charges Defendant Mohamed Sharif Omar with the following offenses:

>   Count One - conspiracy to violate 18 U.S.C. § 1591(a)(1) in violation of 18 U.S.C. § 1594(c) for conspiracy to recruits, entices, harbors, transport, provides, obtains or maintains anyone under the age of 14 and under the age of 18 in violation of 18/1951(a)(1);

>   Count Two - conspiracy to violate 18 U.S.C. § 1591(a)(2) in violation of 18 U.S.C. § 1594(c) for conspiracy to benefit financially or by receiving anything of value, from participating in a venture which recruits, entices, harbors, transports, provides, obtains, or maintains anyone under the age of 14 and under the age of 18 in violation of 18/1951(a)(2);

>   Count Three - conspiracy to obstruct justice in violation of 18 U.S.C. § 1512(k) for conspiracy to knowingly corruptly persuade another person, or attempt to do so, to alter, destroy, mutilate, or conceal an object with the intent to impair the object's integrity and availability for use in an official proceeding and with intent to hinder, delay, and prevent the communication to a law enforcement officer of information relating to the commission or possible commission of a Federal Offense;

>   Count Four - obstruction of justice in violation of 18 U.S.C. § 1591(d); and Count Eleven - violation of 18 U.S.C. § 1591(a)(1) for whoever knowingly did attempt to obstruct, and in any way interfere with and prevent the enforcement of Title 18 U.S.C. § 1591(a).

>   Count Eleven - enticement and transport of a minor female under the age of 14 to engage in commercial sex in violation of 18 U.S.C. § 2 and 1951(a).

>   Count Fifteen - conspiracy to transport in interstate commerce goods of a value over $5000 in violation of 18 U.S.C. § 2314 in violation of 18 U.S.C. § 371 for knowingly did attempt to obstruct, and in any way interfere with and prevent the enforcement of Title 18 U.S.C. § 1591(a).

Id. The maximum possible penalty for Counts One and Two is life imprisonment, for Counts Three, Four and Nineteen is twenty years imprisonment, for Counts Fifteen and Sixteen is five years imprisonment, and for Counts Seventeen and Eighteen is fifteen years imprisonment.

On November 8, 2010, these Defendants were arrested and the United States moved to

3

detain them. (Docket Entry No. 90 and 92). After a detention hearing on November 19, 2010, the Honorable John Bryant,[1] Magistrate Judge, found that the Defendants could be released on certain conditions. (Docket Entry Nos. 246 and 249). The Government filed motions to appeal and to stay and given the nature of the charges, the Court granted a stay pending a hearing on the Government's appeal. (Docket Entry Nos. 266 and 267).

As to the initial hearing on its appeal, Government counsel announced the Government's intention to rely upon the Superseding Indictment and a proffer of its proof to justify the Defendants' detention. The Court informed counsel that based upon his prior experiences as a magistrate judge in this district that the Government always provided witness(es) to justify detention and under United States v. Stone, 608 F.3d 939 (6th Cir. 2010), the Court could require such proof, given that 18 U.S.C. § 3142(f)(B) requires "clear and convincing evidence" to detain a Defendant. Another hearing was set, and the parties were allowed to rely upon any proof presented before the Magistrate Judge.

At the second hearing on December 2, 2010, the Government submitted numerous exhibits and called several witnesses. Defendants called several witnesses. After the hearing, the parties submitted proposed findings of fact and conclusions of law. (Docket Entry Nos. 344, 345 and 346).

## A. Review of the Record

### 1. The Superseding Indictment

In summary, the Superseding Indictment charges the Defendants as members of several

---

[1]Judge Bryant is the second Magistrate Judge to deny the United States' motion for detention, where the Government failed to submit any proof to justify detention. See Docket Entry Nos. 176, 177, 178, 181, 182 186 and 189.

4

gangs known as the Somali Outlaws ("SOL"), based in Minneapolis, Minnesota, the Somali

Mafia, and affiliates of the Lady Outlaws, a female gang that originates from Minneapolis,

Minnesota, but operated in Nashville, Tennessee; St. Paul Minnesota; Columbus, Ohio; and other

locations.   These gangs are interconnected and their members include males and females.

According to Counts One and Two of the Superseding Indictment, from January 2000 to July

2010, these gangs' activities were to identify, recruit and obtain females, including girls who are

under the age of 14 years and under the age of 18 years, to participate in commercial sex acts for

money and other items of value.  (Docket Entry No. 36 at ¶ 2).  Each of these Defendants'

specific acts are set forth below.[2]

### 1. Defendant Abdifatah Sharif Omar

As to his specific overt acts, in Count One, Abdifatah Sharif Omar rented a motel room in

Nashville for a commercial sex act, id. at ¶ 63, but there are not any further facts of his

involvement with that Jane Doe victim set forth.  In Count Two, Defendant Abdifatah Sharif

Omar is charged with a conspiracy to exploit minor age females in commercial sex, id. at ¶ 67,

but there are not any specific facts alleged about his particular role.

In Count Three, Defendant Abdifatah Sharif Omar is charged with conspiring to alter,

destroy, mutilate and conceal an object.  Id. at ¶ 70.  As to his specific acts, on or about April 30,

2009, Defendant Abdifatah Sharif Omar spoke to a co-defendant who asked and Defendant

---

[2] A substantial amount of the Government's proof involved other defendants' acts and
statements.  To be sure, with a conspiracy charge, any act of one conspirator is attributable to
another, but on a motion to detain the Court must consider the specific facts involving the
individual defendant for whom detention is sought.  United States v. Stone, 608 F.3d 939, 946
(6th Cir. 2010) ("the dangerousness inquiry must be an individualized" inquiry with "an
individualized determination of bail eligibility").

Abdifatah Sharif Omar agreed to talk to Jane Doe Two's parents to make sure Jane Doe Two's family cannot come to court. Id. at ¶¶ 72, 74. On April 30, 2009, Abdifatah Sharif Omar told a co-defendant that the co-defendant's telephone was with an unnamed juvenile and that if law enforcement found that telephone, that co-defendant would be "in big trouble." Id. at ¶ 73. On April 30, 2009, Defendant Abdifatah Sharif Omar informed a co-defendant of his attempt to talk to Jane Doe Two, but she would not answer her phone, id. at ¶ 75, and discussed with this co-defendant who could talk to Jane Doe Two "straight." Id.

In Count Four, Defendant Abdifatah Sharif Omar is charged with others in obstructing justice, but that count does not specify any acts by him. Id. at ¶ 82.

In Count Fifteen, from May 20, 2006 through September 15, 2006, in this district, Defendant Abdifatah Sharif Omar is charged with conspiring with others to transport between states stolen goods, wares, merchandise, securities, and money whose value exceeds $5,000. Id. at ¶ 100. Specifically, on May 22, 2006, Defendant Abdifatah Sharif Omar spoke with others about burglarizing a Nashville business and without others, Defendant Abdifatah Sharif Omar entered this business at approximately 2:51 a.m. without permission and removed the safe, obtaining approximately $120,000 in cash, approximately $30,000 in payroll checks and approximately $4000 in phone cards. Id. at ¶¶ 101, 102. Defendant Abdifatah Sharif Omar transported the $120,000 to Minnesota. Id. at ¶ 103. In September 2006, Defendant Abdifatah Sharif Omar and others traveled from Columbus, Ohio to Tennessee to burglarize businesses and took money and merchandise, id. at ¶ 104, namely $1,700 in cash and $7,049 in telephone cards. Id. at ¶ 105.

In Count Sixteen, Defendant Abdifatah Sharif Omar obtained a key to a 2002 Cadillac

6

Escalade from a Nashville business that other co-defendants stole and drove to Ohio. Id. at ¶ 107.

In Count Seventeen, Defendant Abdifatah Sharif Omar is charged with conspiring with others to obtain and use the identification of another person to transport stolen property in interstate commerce. Id. at ¶ 113. The Defendant Abdifatah Sharif Omar's specific overt acts are not specified beyond the factual circumstances set forth in Count Fifteen.

In Count Eighteen, Defendant Abdifatah Sharif Omar is charged with conspiring with others to use a counterfeit access device to obtain items valued in excess of $1,000. Id. at ¶ 118. The Defendant Abdifatah Sharif Omar possessed such a device. Id. at ¶ 119. On February 4, 2010, Abdifatah Sharif Omar went to a Nashville automotive firm and had a key made for a 2002 Cadillac Escalade and utilized counterfeit and unauthorized access devices to obtain a key to that vehicle that later was stolen. Id. at ¶¶ 133, 134. On March 27, 2010, Abdifatah Sharif Omar and another co-defendant drove the stolen 2002 Cadillac Escalade from Minneapolis, Minnesota, to Kansas City, Missouri, using counterfeit and unauthorized access devices at various locations. Id. at ¶ 139. On March 28, 2010, in Kansas City, Missouri, Addifatah Sharif Omar used and attempted to use counterfeit devices and unauthorized access devices in the following transactions:

      A: Dillard's Department Store in the amount of $334.55 and $398.85;

      B. Macy's Department Store in the amount of $226.77 and $538.44;

      C. Wal-Mart Store in the amount of $1040.46 and $650.96;

      D. Toys R Us Store in the amount of $225.65 and $300.00; and

      E. Waffle House in the amount of $25.74.

Id. at ¶ 140. On March 28, 2010, Abdifatah Sharif Omar and another co-defendant drove a stolen

2002 Cadillac Escalade from Kansas City, Missouri to Minnesota, using counterfeit and unauthorized access devices to make a purchase of $210.l84. Id. at ¶ 141. On March 28, 2010, Abdifatah Sharif Omar and another co-defendant had a laptop computer containing unauthorized access devices, totaling more than 500 separate credit card numbers. Id. at ¶ 142.

From March 28, 2010 through March 29, 2010 in Ramsey County, Minnesota, Defendant Abdifatah Sharif Omar told Abdigadir Ahmed Khalif to tell Ahmed Aweys Sheik not to speak to the police about the counterfeit and unauthorized access devices. Id. at ¶ 141. Khalif allegedly told Sheik not to talk to the police about Abdifatah Sharif Omar because he was their "friend" and to tell the same thing as Abdifatah Sharif Omar did because the police did not know anything. Id. at ¶ 143.

In Count Nineteen, from March 28, 2010 through March 29, 2010 in this district, Defendant Abdifatah Sharif Omar conspired with others to persuade another person to alter, destroy, mutilate, or conceal an object to impair the object's integrity and availability for use in an official proceeding and to interfere with communication to a law enforcement officer about a federal offense. Id. at ¶ 151. By reference this conspiracy involved the unauthorized or counterfeit access devices. Id. at ¶ 152. The specific acts include an attempt to influence an unnamed witness, id. at ¶ 154, but his specific acts are not set forth.

## 2. Mohamed Sharif Omar

As to Defendant Mohamed Sharif Omar's specific acts in Count One, the Superseding Indictment charges that in December 2005, Defendant Mohamed Sharif Omar and others transported Jane Doe One to Nashville to engage in commercial sex. Id. at ¶ 5. From October 2006 to June 2007, Defendant Mohamed Sharif Omar and others caused Jane Doe One to engage

8

in commercial sex in Columbus, Ohio. Id. at ¶ 9. From April 1, 2008 to June 2, 2008, Defendant Mohamed Sharif Omar and other took Jane Doe One to a residence in Seattle, Washington where she was sexually assaulted. Id. at ¶ 10.

For specific acts for the conspiracy in Count Two, to exploit minor females for commercial sex, there are not any specific facts except those described above.

Count Three charges Defendant Mohamed Sharif Omar as a member of a conspiracy to alter, destroy, or conceal evidence. Id. at ¶ 70. The Defendant Mohamed Sharif Omar's specific acts included his report to a co-defendant on May 1, 2009 that Jane Doe Two's parents were in Nashville and that Defendant Mohamed Sharif Omar would talk to a relative of Jane Doe Two that night. Id. at ¶ 76.

Count Four charges Defendant Mohamed Sharif Omar and others attempting to obstruct law enforcement, but his specific acts are not set forth, id. at ¶ 82, nor is there any reference to incorporate any other paragraph of the Superseding Indictment for any overt acts.

In Count Eleven, Defendant Mohamed Sharif Omar and others are charged with recruiting and enticing Jane Doe One, under the age of 14, to engage in commercial sex, but his specific role is not described, id. at ¶ 96, nor is there any reference to incorporate any other paragraph of the Superseding Indictment for any overt acts.

In Count Fifteen, Defendant Mohamed Sharif Omar and others are charged with conspiring to transport stolen goods on interstate commerce from May 20, 2006 to September 15, 2006. Id. at ¶ 100. Defendant Mohamed Sharif Omar's specific acts were to enter the establishment and steal $120,000 in cash, $30,000 in payroll checks and $4,000 in telephone cards from that establishment. Id. at ¶ 102.

9

Count Eighteen charges a conspiracy to produce and use counterfeit access devices from 2007 to 2009. Id. at ¶¶ 117, 119. Defendant Mohamed Sharif Omar's specific role is not identified. Overt acts are set forth for co-defendants, but do not describe any act by Defendant Mohammed Sharif Omar.

### 3. Government's Proof[3]

The Government called two police officers, an agent of the Federal Bureau of Investigation ("FBI") and a Nashville airport security officer.

Christopher Bennet and Bruce Carpenter, officers with the Minneapolis Police Department, described their investigation of a carjacking involving Defendant Abdifatah Sharif Omar. According to Bennett, on July 27, 2009, Abdigadir Ahmed Khalif, a victim of a carjacking reported that two persons, one of whom was Defendant Abdifatah Sharif Omar, pulled a gun on him in a mall parking lot and forced Khalif out of his vehicle. Khalif identified his assailants, including Defendant Abdifatah Sharif Omar. During Bennett's investigation, Khalif got some telephone calls that his residence had been burglarized. Khalif also described a vehicle in which his assailants drove. The officer observed such a vehicle in which Defendant Abdifatah Sharif Omar was a passenger. Among the vehicle's passengers, only one firearm was recovered from Abdullahi Abdullahi. Defendant Abdifatah Sharif Omar was cooperative in the investigation.

---

[3]The Government cites the pretrial services report that is not part of the record, reflecting that Defendant Abdifatah Sharif Omar was arrested on July 12, 2010 for the assault and that his next court appearance is January 10, 2011. The Pretrial Services report reflects Defendant Abdifatah Sharif Omar being arrested 9 separate occasions, from the age of 19 to 26. Notably, on June 15, 2009, Defendant Abdifatah Sharif Omar was arrested for patronizing prostitution, but that charge was dismissed on November 25, 2009, with payment of costs.

Bruce Carpenter testified that the carjacking victim identified Defendant Abdifatah Sharif Omar as having a firearm and as the assailant who forced him out of his vehicle. Carpenter explained that in a second interview, the victim recanted his earlier statement, but reaffirmed that Defendant Abdifatah Sharif Omar had a firearm. Based on that recantation, local officials had not decided on pursuing charges.

Stephen Fogarty, an FBI agent, testified that the investigation revealed that in the latter half of 2006, "an individual identified by the street name or alias of Cash Money and Mo D, later identified as Defendant Mohamed Sharif Omar" forced the victim to have sex with several males for money and when the victim refused, Defendant Mohamed Sharif Omar had her forcefully drugged with cocaine and marijuana. (December 2, 2010 Hearing Transcript at 89). Defendant Mohamed Sharif Omar correctly notes that there are two defendants who are associated with the alias "Cash Money." (Docket Entry No. 36 Superseding Indictment at 2) (listing Defendant Abdifatah Bashir Jama as "Cash Money"). The Court also notes that Agent Fogarty testified that the person also had the alias "Mo D" and was later identified to be Defendant Mohamed Sharif Omar.

Robert Merrit, a Nashville airport security officer, described his response to a disorderly conduct complaint on June 27, 2009 at the airport. Defendant Mohamed Sharif Omar and Defendant Abdifatah Sharif Omar and were among three individuals who were complaining about the denial of a rental car when they returned an earlier rental vehicle eight days late. The latter rental vehicle was searched and 31 grams of marijuana was found inside the vehicle's console and trunk. Defendant Abdifatah Sharif Omar had $1,959 in cash on his person, was uncooperative, and was arrested. Defendant Mohamed Sharif Omar was not arrested.

11

The United States also presented a series of transcripts of telephone calls on May 9th, 2009; May 12th, 2009; May 13th, 2009; July 27th, 2009; July 28th, 2009; and September 27th, 2010, (Government Exhibits 3 through 35), that are not authenticated and have gaps, but the Government contends that these calls reflect Defendants' efforts to obstruct various legal proceedings. The callers' names are provided by the Government.

In Government Exhibit 4, Defendant Abdifatah Sharif Omar states that, "[W]e are trying to talk to the young girl, but she is not talking. She ignore me." Id. at 3. Defendant Abdifatah Sharif Omar then inquires to whom the girl is related, and a co-defendant asks Defendant Abdifatah Sharif Omar if he "knows who could talk to her straight." Id. A co-defendant asks Defendant Abdifatah Sharif Omar to "call the girl's family, who wanted to press charges." Id. Abdifatah Sharif Omar inquires as to how to get the family's telephone number, and a co-defendant directs him to call another co-defendant, which Defendant Abdifatah Sharif Omar agreed to do. Id.

Defendant Abdifatah Sharif Omar was contacted to talk to a cousin who knows a member of the girl's family. Id. at 7. Defendant Abdifatah Sharif Omar describes his efforts to talk to the cousin and the girl. Id. at 7. A co-defendant tells Defendant Abdifatah Sharif Omar to "make sure her family -- that they cannot come to court", id. at 11, and asks Defendant Abdifatah Sharif Omar whether the girl had erased the pictures off of her phone. Id.

In one conversation, Defendant Abdifatah Sharif Omar asks a co-defendant if the "rest of the guys, did they talk" and the co-defendant responded: "No, no, no, man, they didn't talk. They said they were doing a favor for her, giving her a ride," and Defendant Abdifatah Sharif Omar responds, "That is not normal." (Government's Exhibit 6 at 10).

12

Defendant Mohamed Sharif Omar ("MOS") states he did not like to talk over the phone.

He then tell co-defendant Liban Omar:

MOS: Well, yeah, I swear I can't tell you what happened. You know the stupid guy?

LIBAN: The actor?

MOS: The actor. The actor, do you know the guy that the guy's bust his ass.

LIBAN: Who? They guy that gets his ass busted, is that they guy you mean with a lot of teeth?

MOS: Yes, that guy.

LIBAN: What?

MOS: He knew about that situation.

LIBAN: What situation?

MOS: The situation.

LIBAN: Okay.

MOS: They even know that everything. They even know that you were behind everything.

LIBAN: Me?

MOS: Yes.

(Government's Exhibit 26 at 2-3).

The Government cites another conversation with Defendant Abdifatah Sharif Omar ("ASO"), who had the following exchange with a co-defendant:

ASO: Yeah, this lady she was like, "hey, aren't you the same nigger that sells the young girls who has a case pending on him?" You know what I mean?

HAJI: Okay.

ASO: And I told her, "aren't you the same bitch I took you to Memphis, Tennessee and I couldn't sell you, you be fucking for free."

(Government Exhibit 36 at 11).

### 4. Abdifatah Sharif Omar's Proof

In the first hearing before the Magistrate Judge, Defendant Abdifatah Sharif Omar presented proof of his enrollment online college until he is admitted to Tennessee State University. Defendant Abdifatah Sharif Omar was a driver of commercial freight and has an offer to return to that employment. Defendant Abdifatah Sharif Omar has been a Nashville resident for four years and his mother and brothers reside in Nashville.

At the December 2, 2010 hearing, Abdirahman Omar, Defendant Abdifatah Sharif Omar's older brother testified that he has lived in Nashville for the past nine years and his younger brother lived in Nashville, Tennessee for four or five years since he left Minnesota. Abdirahman Omar agreed to serve as a third party custodian for his brother who would live at his residence at 954 Village Hills Drive, Nashville, Tennessee and to report his brother for any violation of the order imposing conditions of release or the law. Abdirahman Omar testified that a cousin, Mustafa Omar, would pledge his property as collateral, but Mustafa Omar did not so testify.

Abdirahman Omar is a mechanic for Embraer Aircraft Maintenance, ("EAM") and has a security clearance at his employer's work site. Abdirahman Omar admitted that he allowed another brother, Liban Sharif Omar, into EAM's maintenance area without complying with EAM policies. Liban Sharif Omar took photographs of the hangar area and was in the cockpit of one of the EAM's airplanes. (See Government Exhibits 1A through 1E). Abdirahman Omar insists

14

that his brother was escorted into the area by an authorized EAM personnel, and that he had permission from an authorized EAM person to take the photographs, but was unable to identify any such person.

EAM witnesses testified that Abdirahman Omar was not authorized to transport visitors into its maintenance area, and that their records do not reflect such approval for this visit nor the photographs. Such photographs require prior approval by a manager, managing director, vice-president of operations, or director of hangar operations. EAM does not permit any visitor access to an airplane's cockpit. Abdirahman Omar did not report the cited visit or photographs to EAM, but insists that other unnamed employees brought family members to visit the hangar area.

Abdirahman Omar described Abdifatah Sharif Omar's prior work at Import Auto Sales in Nashville, Tennessee and submitted a letter from that employer. At Abdirahman Omar's request, the employer agreed that Abdifatah Sharif Omar could return to work. On cross examination, Abdirahman Omar conceded that this letter was initially written by his uncle and that he was not present when the letter was obtained nor had he spoken with the employer. Abdirahman Omar also stated on cross examination that Abdifatah Sharif Omar actually worked there for less than two months. Abdirahman Omar further testified that Abdifatah had been a truck driver in 2007 and/or 2008.

Defendant Abdifatah Sharif Omar's mother was proffered as a suitable third party custodian for defendant Abdifatah Sharif Omar, but she does not speak English. The Government argues she could not or would keep the defendant from communicating with co-defendants, witnesses, or victims in this case and proffered that earlier this defendant's sister, a juvenile, revealed Defendant Abdifatah Sharif Omar's and his brothers' operation of a

15

prostitution business from that residence by directing men to hotels to engage in sex with females.

### 5. Defendant Mohamed Sharif Omar's Proof

Abdirahman Omar, who is also Mohamed Sharif Omar's brother, testified that he had never seen him drinking or smoking marijuana or using any kind of drugs. Abdirahman Omar lives with his fiancé and daughter and neither had any encounter of inappropriate conduct with Defendant Mohamed Sharif Omar. Abdirahman Omar has not observed any sexually inappropriate conduct by Defendant Mohamed Sharif Omar with the latter's girlfriend. Defendant Mohamed Sharif Omar previously worked at Budget Rent A Car for seven years with excellent attendance, performance award, increasing responsibility and complimentary letters from customers.

Salah Jamal Ayesh, owner of Invesco, Inc., described Defendant Mohamed Sharif Omar's work as his employee for the last three years, but lacked time records of Mohamed Sharif Omar's actual work.

According to Ayesh, Mohamed Sharif Omar was hired to transport cars and later became a buyer in the last twelve to eighteen months. Prior to becoming a buyer, Mohamed Sharif Omar traveled frequently, but had not traveled much in the past twelve to eighteen months. Ayesh testified that Mohamed Sharif Omar still travels, with the most recent trip in November 5, 2010. Ayesh testified that Mohamed Sharif Omar usually worked from home very early in the morning, then goes into the office around 9:00 a.m. Ayesh described Mohamed Sharif Omar work at six hours, six days a week with occasional work on Sundays. Invesco pay records reflect payments to Mohamed Sharif Omar 2007 from U.S. Auto Inc., of $39,165.96; by 2008 from Invesco, same

address as U.S. Auto, $31,547.47; and $29,900 in 2009.  (Government Exhibit 39).

Based upon his testimony on cross examination, the Government contends that Ayesh contradicted his November 19, 2010 testimony where he testified that Mohamed usually worked from home early in the morning, but would arrive in the office around 9:00. On December 2, 2010, Ayesh testified that he had no way of knowing where Mohamed was working from, and that Mohamed could be working from anywhere.  (Transcript of Detention Hearing, December 2, 2010 at 97-100).

Ayesh is also Defendant Mohamed Sharif Omar's landlord and provided the $21,000 dawn payment for the purchase of that property, expecting Mohamed Sharif Omar eventually to purchase the home and repay the $21,000.  Ayesh has a close relationship with Mohamed Sharif Omar, calling him "his son."  Mohamed Sharif Omar informed Ayesh of an altercation in a store with a female with whom Mohamed Sharif Omar had a previous relationship.   Ayesh did not know any of the facts of that assault.  Ayesh stated that Mohamed Sharif Omar's brothers used Omar's name for traffic violations, not arrests.

Ibrahim Warsame, an employee with the Metropolitan Nashville Davidson County Public Health Department, agreed to serve as a third party custodian for Mohamed Sharif Omar, whom he had known for eight years.  Warsame met Mohamed Sharif Omar through his brother and also knows members of the Omar family.  Warsame now serves as a custodian for a co-defendant, Muhiyadan Hassan Abdirahman Omar.

Urszulla Ralcewicz, Mohamed Sharif Omar's assistant testified that in her experiences, Defendant Mohamed Sharif Omar did not drink or use drugs.  Due to a news story, she learned of Mohamed Sharif Omar's charge for "hitting a lady."  Defendant Mohamed Sharif Omar told

17

Ralcewicz that the girl spit in his face, and he lost control. Ralcewicz was unaware of any other such incidents involving Defendant Mohamed Sharif Omar other than traffic tickets. The Government asserts that a video of the incident showed Defendant Mohamed Sharif Omar "pushing the lady".

In another jail transcript, co-defendant Haji Osman Salad stated that "we were going to say we were doing a favor for her" and that he "just came to the scene." Defendant Abdifatah Sharif Omar stated "Even you, Mo Jo told you not to go to the place." Mo Jo is Defendant Mohamed Sharif Omar. (Docket Entry No. 346 at 21).

### B. Conclusions of Law

The relevant portions of 18 U.S.C. § 3142 in deciding the Government's motion to detain these defendants provide are as follows:

> (e) Detention.--(1) If, after a hearing pursuant to the provisions of subsection (f) of this section, **the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial.** ...
>
>            \*    \*    \*
>
> **...it shall be presumed that no condition or combination of conditions will reasonable assure ... the safety of the community if the judicial officer find that there is probable cause to believe that the person committed ... an offense involving a minor victim under section 1201, 1591, 2241, 2242, 2244(a)(1), 2245, 2251, 2251A, 2252(a)(1), 2252(a)(2), 2252(a)(3), 2252A(a)(1), 2252A(a)(2), 2252A(a)(3), 2252A(a)(4), 2260, 2421, 2422, 2423, or 2425 of this title.**
>
> (2) Upon motion of the attorney for the Government or upon the judicial officer's own motion, in a case that involves--
>
>     **(A) a serious risk that such person will flee; or**
>
>     **(B) a serious risk that such person will obstruct or attempt to**

18

**obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror.**

18 U.S.C. § 3142(e) and (f)(2)(A) and (B) (emphasis added).

In deciding the detention issue, the Court must consider the following factors:

(g) Factors to be considered.--The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning--

(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including--

(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

\*   \*   \*

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. In considering the conditions of release described in subsection (c)(1)(B)(xi) or (c)(1)(B)(xii) of this section, the judicial officer may upon his own motion, or shall upon the motion of the Government, conduct an inquiry into the source of the property to be designated for potential forfeiture or offered as collateral to secure a bond, and shall decline to accept the designation, or the use as collateral, of property that, because of its source, will not reasonably assure the appearance of the person as required.

19

18 U.S.C. § 3142(g). If the motion to detain is denied, then the Court must set conditions of release,[4] with special conditions for crimes involving a minor.[5]

---

[4] (c) Release on conditions.--(1) If the judicial officer determines that the release described in subsection (b) of this section will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community, such judicial officer shall order the pretrial release of the person--

(A) subject to the condition that the person not commit a Federal, State, or local crime during the period of release and subject to the condition that the person cooperate in the collection of a DNA sample from the person if the collection of such a sample is authorized pursuant to section 3 of the DNA Analysis Backlog Elimination Act of 2000 (42 U.S.C. 14135a); and

(B) subject to the least restrictive further condition, or combination of conditions, that such judicial officer determines will reasonably assure the appearance of the person as required and the safety of any other person and the community, which may include the condition that the person--

(I) remain in the custody of a designated person, who agrees to assume supervision and to report any violation of a release condition to the court, if the designated person is able reasonably to assure the judicial officer that the person will appear as required and will not pose a danger to the safety of any other person or the community;

(ii) maintain employment, or, if unemployed, actively seek employment;

(iii) maintain or commence an educational program;

(iv) abide by specified restrictions on personal associations, place of abode, or travel;

(v) avoid all contact with an alleged victim of the crime and with a potential witness who may testify concerning the offense;

(vi) report on a regular basis to a designated law enforcement agency, pretrial services agency, or other agency;

(vii) comply with a specified curfew;

(viii) refrain from possessing a firearm, destructive device, or other dangerous weapon;

(ix) refrain from excessive use of alcohol, or any use of a narcotic drug or other controlled substance, as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802), without a prescription by a licensed medical practitioner;

(x) undergo available medical, psychological, or psychiatric treatment, including treatment for drug or alcohol dependency, and remain in a specified institution if required for that purpose;

(xi) execute an agreement to forfeit upon failing to appear as required, property of a sufficient unencumbered value, including money, as is reasonably necessary

20

The Government asserts several theories for detention. The first theory is danger to the community based upon the detention statute's statutory presumption of dangerousness for persons charge with criminal acts "involving a minor victim." 18 U.S.C. § 3142(e)(3)(A). This presumption is based upon the indictment that is governed by the probable cause standard, but the statutory standard for detention is clear and convincing evidence. 18 U.S.C. § 3142(e). Congress contemplated that defendants charged with crimes involving minor victims may be granted pretrial release, as reflected in 18 U.S.C. § 3142(c)(1)(B), by requiring electronic monitoring as a condition of release for such a defendant. Detention under this theory requires the Court to examine the specific acts of each defendant to determine if the Government's proof is clear and convincing that a defendant's detention pending trial is warranted.

---

to assure the appearance of the person as required, and shall provide the court with proof of ownership and the value of the property along with information regarding existing encumbrances as the judicial office may require;

(xii) execute a bail bond with solvent sureties; who will execute an agreement to forfeit in such amount as is reasonably necessary to assure appearance of the person as required and shall provide the court with information regarding the value of the assets and liabilities of the surety if other than an approved surety and the nature and extent of encumbrances against the surety's property; such surety shall have a net worth which shall have sufficient unencumbered value to pay the amount of the bail bond;

(xiii) return to custody for specified hours following release for employment, schooling, or other limited purposes; and

(xiv) satisfy any other condition that is reasonably necessary to assure the appearance of the person as required and to assure the safety of any other person and the community.

18 U.S.C. § 3142(c).

[5] "In any case that involves a minor victim under section 1201, 1591, 2241, 2242, 2244(a)(1), 2245, 2251, 2251A, 2252(a)(1), 2252(a)(2), 2252(a)(3), 2252A(a)(1), 2252A(a)(2), 2252A(a)(3), 2252A(a)(4), 2260, 2421, 2422, 2423, or 2425 of this title, or a failure to register offense under section 2250 of this title, any release order shall contain, at a minimum, a condition of electronic monitoring and each of the conditions specified at subparagraphs (iv), (v), (vi), (vii), and (viii)." 18 U.S.C. § 3142(c).

The Government's second theory for detention is the defendants' post-arrest attempts to obstruct justice by attempting to persuade the victim and the victim's family not to cooperate with the authorities. Section 3142(f)(2)(B) requires proof that a defendant poses "a serious risk" to "obstruct or attempt to obstruct justice or threaten, injure or intimidate...a witness."[6] Related to both theories, the Government argues that the evidence does not establish any pretrial release conditions that would protect the public.

Defendant Abdifatah Sharif Omar contends that the Government lack of proof from any witness who observed criminal behavior by him and the Government has not explained the identification of the voices from the transcripts presented.

Assuming the correct identification of the individuals on the jail transcripts, Defendant Mohamed Sharif Omar contends that he appears infrequently in the Government's transcripts and was only sympathetically listening to the caller. Defendant Mohamed Sharif Omar notes that the Government did not identify any evidence of an actual attempt by him to speak or communicate

---

[6] (2) Upon motion of the attorney for the Government or upon the judicial officer's own motion, in a case that involves--

> (A) a serious risk that such person will flee; or
>
> (B) a serious risk that such person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror.

The hearing shall be held immediately upon the person's first appearance before the judicial officer unless that person, or the attorney for the Government, seeks a continuance. . . . At the hearing, such person has the right to be represented by counsel, and, if financially unable to obtain adequate representation, to have counsel appointed. The person shall be afforded an opportunity to testify, to present witnesses, to cross-examine witnesses who appear at the hearing, and to present information by proffer or otherwise. The rules concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the hearing. **The facts the judicial officer uses to support a finding pursuant to subsection (e) that no condition or combination of conditions will reasonably assure the safety of any other person and the community shall be supported by clear and convincing evidence.**

18 U.S.C. § 3142(f)(2).

with victims or members of the victims' families. In Defendant Mohamed Sharif Omar's view, the transcripts reflect Defendant Mohamed Sharif Omar's knowledge of the alleged victim and her family since September 2009.

As to the dangerousness theory, in <u>United States v. Salerno</u>, 481 U.S. 739 (1987), the Supreme Court upheld Section 3142 against constitutional challenges because detention involved a regulatory function of protection of the community, not interim punishment for being charged with certain offenses:

> **We conclude that the detention imposed by the Act falls on the regulatory side of the dichotomy. The legislative history of the Bail Reform Act clearly indicates that Congress did not formulate the pretrial detention provisions as punishment for dangerous individuals. See S.Rep. No. 98-225, at 8. Congress instead perceived pretrial detention as a potential solution to a pressing societal problem.** <u>Id.,</u> at 4-7.

> The Bail Reform Act carefully limits the circumstances under which detention may be sought to the most serious of crimes.

> \* \* \*

> **We have repeatedly held that the Government's regulatory interest in community safety can, in appropriate circumstances, outweigh an individual's liberty interest.**

> \* \* \*

> **We have approved of postarrest regulatory detention of juveniles when they present a continuing danger to the community.**

> \* \* \*

> **The government's interest in preventing crime by arrestees is both legitimate and compelling.**

<u>Id.</u> at 747, 748, 749.

The Supreme Court also noted that detention is usually reserved for "extremely serious

23

offices" where the facts of a given case demonstrate that the Government's interests are

"overwhelming."

> The Bail Reform Act, in contrast, narrowly focuses on a particularly acute
> problem in which the Government interests are overwhelming. The Act operates
> only on individuals who have been arrested for a specific category of extremely
> serious offenses. 18 U.S.C. § 3142(f). Congress specifically found that these
> individuals are far more likely to be responsible for dangerous acts in the
> community after arrest. . . . **The Government must first of all demonstrate**
> **probable cause to believe that the charged crime has been committed by the**
> **arrestee, but that is not enough. In a full-blown adversary hearing, the**
> **Government must convince a neutral decisionmaker by clear and convincing**
> **evidence that no conditions of release can reasonably assure the safety of the**
> **community or any person. 18 U.S.C. § 3142(f). While the Government's**
> **general interest in preventing crime is compelling, even this interest is**
> **heightened when the Government musters convincing proof that the arrestee,**
> **already indicted or held to answer for a serious crime, presents a**
> **demonstrable danger to the community. Under these narrow circumstances,**
> **society's interest in crime prevention is at its greatest.**

> \*   \*   \*

> We think that Congress' careful delineation of the circumstances under which
> detention will be permitted satisfies this standard. When the Government proves
> by clear and convincing evidence that an arrestee presents an identified and
> articulable threat to an individual or the community, we believe that, consistent
> with the Due Process Clause, a court may disable the arrestee from executing that
> threat.

Id. at 750, 751, 752.

In United States v. Stone, 608 F.3d 939 (6th Cir. 2010), the Sixth Circuit set forth the

burden shifting evidentiary framework for detention hearings based upon dangerousness:

> Under the Bail Reform Act, 18 U.S.C. § 3142, upheld . . . in Salerno, a defendant
> may be detained pending trial only if a judicial officer "finds that no condition or
> combination of conditions will reasonably assure the appearance of the person as
> required and the safety of any other person and the community[.]" 18 U.S.C. §
> 3142(e). A judicial officer's finding of dangerousness must be "supported by clear
> and convincing evidence." 18 U.S.C. § 3142(f)(2)(b). The default position of the
> law, therefore, is that a defendant should be released pending trial.

24

That default is modified, however, for certain, particularly dangerous defendants. Specifically, when a "judicial officer finds that there is probable cause to believe" that a defendant committed one of the crimes listed in section 3142(e)(3), there is a presumption in favor of detention: "Subject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community[.]" 18 U.S.C. § 3142(e)(3). A grand jury indictment, by itself, establishes probable cause to believe that a defendant committed the crime with which he is charged Hazime, 762 F.2d at 37. Thus, **when the government presents an indictment including charges listed in section 3142(e)(3), it has fulfilled its burden to establish the presumption in favor of detention.**

As our sister circuits have found, section 3142(e)(3)'s presumption in favor of detention imposes only a "burden of production" on the defendant, and the government retains the "burden of persuasion." See, e.g., United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001); United States v. Portes, 786 F.2d 758, 764 (7th Cir. 1985). **A defendant satisfies his burden of production when he "com[es] forward with evidence that he does not pose a danger to the community or a risk of flight." Mercedes, 254 F.3d at 436. Although a defendant's burden of production "is not heavy," he must introduce at least some evidence.** United States v. Stricklin, 932 F.2d 1353, 1355 (10th Cir. 1991); see also United States v. Rodriguez, 950 F.2d 85, 88 (2d Cir. 1991) ("[A] defendant must introduce some evidence contrary to the presumed fact in order to rebut the presumption.").

**Even when a defendant satisfies his burden of production, however, "the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court." Mercedes, 254 F.3d at 436. The presumption remains as a factor because it is not simply an evidentiary tool designed for the courts. Instead, the presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial.** See United States v. Jessup, 757 F.2d 378, 384 (1st Cir. 1985), abrogated on other grounds by United States v. O'Brien, 895 F.2d 810 (1st Cir. 1990), ("Congress intended magistrates and judges, who typically focus only upon the particular cases before them, to take account of the more general facts that Congress found"); see also United States v. Dominguez, 783 F.2d 702, 707 (7th Cir. 1986) ("[T]he presumption of dangerousness ... represents Congressional findings that certain offenders ... are likely to continue to engage in criminal conduct undeterred either by the pendency of charges against them or by the imposition of monetary bond or other release conditions."). To rebut the presumption, therefore, a defendant should "present all the special features of his case" that take it outside "the congressional paradigm

[.]" Jessup, 757 F.2d at 387.

Id. at 945-46.

Although Section 3142 permits the admission of hearsay evidence to meet the clear and

convincing standard, the hearsay evidence must be reliable. United States v. Thomas, 2006 WL

140558, at *9 (D. Md. 2006).

> [T]he Court must nevertheless ensure that the evidence upon which it relies is
> reliable. United States v. Goba, 240 F. Supp. 2d 242, 247 (W.D.N.Y. 2003). . .
> United States v. LaFontaine, 210 F.3d 125, 131 (2d Cir. 2000) (explaining that
> magistrate judges must ensure reliability "by selectively insisting upon the
> production of the underlying evidence or evidentiary sources where their accuracy
> is in question") (internal citations omitted)); United States v. Acevedo-Ramos,
> 755 F.2d 203, 206-08 (1st Cir. 1985) (assuming that evidence used for purposes of
> detention determinations must be reliable); United States v. Accetturo, 623 F.
> Supp. 746, 755 (D.N.J. 1985).

Id.

A detention hearing may be conducted by the parties' proffers in the discretion of the

court. Stone, 608 F.2d at 948, citing with approval United States v. Webb, 238 F.3d 426 (table),

2000 WL 1721060, at *8 (6th Cir. 2000) ("[T]the government may proceed in a detention

hearing by proffer or hearsay."); United States v. Smith, 79 F.3d 1208, 1210 (D.C. Cir. 1996)

("Every circuit to have considered the matter ... [has] permitted the Government to proceed by

way of proffer."). As to the Government's reliance on the Superseding Indictment alone to

justify detention, there is not any decision cited for that proposition.

Here, initially, in the absence of any proof from the Government and the statutory

requirement that the court weigh the evidence to determine detention, the Magistrate Judge

correctly found that the Defendants' proof and proffers were sufficient to overcome the statutory

presumption of dangerousness. After this Court's insistence on some proof, consistent with the

26

historical practice in the Court's experience, the Government submitted some proof that now must be considered for each defendant separately on this de novo review of the Magistrate Judge's release Order. Stone, 608 F.3d at 946. ("the dangerousness inquiry must be an individualized" one with "an individualized determination of bail eligibility").

As to Defendant Abdifatah Sharif Omar, there are two counts of separate conspiracies to engage in the sexual exploitation of minors over a period of years in which he rented a room for the sexual exploitation of a minor. Those charges give rise to a presumption of his dangerousness. The Government's proof includes this Defendant's armed carjacking in 2009 in which Defendant forced the victim out of his vehicle. Although the victim of that carjacking recanted, in part, the victim restated that this Defendant was armed during this carjacking. In addition to the charges of interstate transportation of stolen goods of substantial value using counterfeit devices, in 2009, Defendant Abdifatah Sharif Omar was found with marijuana and more than $1900 in cash after the return of a rental vehicle eight days beyond the scheduled return date. Albeit in a different factual setting, multiple sexual acts with a minor warrant detention. United States v. Abad, 350 F.3d 793, 796, 798-99 (8th Cir. 2003) (vacating a release order of defendant charged with interstate travel to have sex with a minor). Given these facts, the Court concludes that Defendant Abdifatah Sharif Omar should be detained.

As to Defendant Mohammed Sharif Omar, there are two counts of separate conspiracies to engage in the sexual exploitation of minors over a period of years in which he rented a room for the sexual exploitation of a minor that also gives rise to a presumption of his dangerousness. According to the victim interview, the Defendant Mohammed Sharif Omar coerced the minor female victim into sexually exploitive acts with multiple males in 2006. When the victim

27

refused, Defendant Mohamed Sharif Omar forced her to ingest cocaine and marijuana. Given this Defendant's multiple exploitations of this minor, the need to protect minors from such exploitation, the Court concludes that under <u>Abad</u>, Defendant Mohamed Sharif Omar must be detained.

As to the Government obstruction theory, in this Circuit, a defendant's contact with a witness in the case is not grounds for detention despite the defendant's past history of contacting witnesses to assist in his defense. <u>United States v. LaLonde</u>, 246 F. Supp. 2d 873, 875-76 (S.D. Ohio 2003). There is not a <u>per se</u> rule that an obstruction of justice charge warrants detention. <u>United States v. Demmler</u>, 523 F. Supp. 2d 677, 681, 682, 683 (S.D. Ohio 2007) ("Finally, the Court will not assume that just because Demmler has been charged with witness tampering and obstruction of justice, he is likely to commit these same offenses again during the course of these proceedings. Indulging such an assumption would be tantamount to creating a per se rule of detention in cases involving witness tampering and obstruction, which this Court has already declined to do."). Given the defense challenges to the preparation of these transcripts and the lack of proof about the methods of identification of voices, the Court declines to base detention on that proof.

Finally, the Court does not consider these Defendants' proof about their suggested conditions of pretrial release sufficient to justify their release pending trial.

For these reasons, the Government's motion to detain these defendants should be granted. An appropriate Order is filed herewith.

**ENTERED** this the ____ day of March, 2011.

WILLIAM J. HAYNES, JR.
United States District Judge

29